The last matter on calendar for argument is EDJ Hershewe v. JOYY, Inc. Case number 22-55377. Good morning. May it please the Court? Are we only going to have one argument on each side? That's correct. Okay. Thank you. Go ahead. Good morning. May it please the Court? My name is Lucas Gilmore of the law firm of Huggins, Berman, Sobel, and Shapiro. We represent the lead plaintiffs in this securities class action. I'm going to heed the Court's warning about—the Court is well familiar with the facts, so I'd like to focus my presentation on three issues that are relevant to the issues that the Court will decide. The first issue has to do with the Muddy Waters report, which really forms the basis of the complaint. That's a report that reflects years of intensive study by a credible investigation firm and under the applicable tests possesses the minimum indicia of reliability. The second issue, which also goes to the falsity issue, is this complaint does not rely solely on a short seller report. It relies on an extensive investigation done by plaintiffs' counsel, including the well-reasoned conclusions of a bot expert, Dr. Knobloch, who not only substantiated and reviewed independently the Muddy Waters report, but conducted a supplemental analysis and found independent findings that were entirely consistent. We also rely upon confidential witnesses, three separate accounts, and then there are also, we cite, two significant post-class period events. So you had one opportunity to amend, right? That's correct. And you essentially did the same thing. Your Honor, we believe that we addressed the defects that were identified. The defects that were identified were to provide further information regarding Dr. Knobloch's and his review, independent review, and conclusions about the Muddy Waters report. We believe that we clarified that. And so we believe, as a matter of law, you know, we did make substantive changes and address those. So where in the record do plaintiffs relate Joy's alleged use of bots to its alleged inflation of revenues? Where in the record does that go? Because obviously you're dealing with a heightened pleading standard, so that's what we have to look at here. Yeah, well, you would look at Joy's public statements. It says that it derives all of its revenue from gifts that are given on the platform. So you would also look at just the Muddy Waters report and the extensive efforts that were done in doing this, and it raises the plausible conclusion is, why would a company go to the effort of systemically 90% of all the gifts that are done are fake? Why would it go to that? And it's obviously for a financial incentive. Well, so do you agree that the plaintiffs rely on the imprints of scienter from a grand showing of fraud, and accordingly, if there's no showing of fraud, there's no scienter? Your Honor, I'd have to unpack that statement. What we rely upon, there are two separate inquiries. One is the minimum and disreliability of the Muddy Waters report, the supplemental information that we substantiated. That inquiry is whether it's a reasonable inference of falsity. The separate inquiry is scienter, whether there's a strong inference of scienter. You take a look at the facts that we have. If the court finds that we plausibly alleged that this entire enterprise is fraudulent, 90% of the revenue is fraudulent, then the court could look to Ninth Circuit law, which we cited to Reese v. Malone, to Burson v. Applied, in the core operations doctrine, in which it would be absurd to suggest that the defendants did not know about this grand operation and revenue. Is it undisputed that Muddy Water had a short position? Yes, Your Honor. Can you explain that, what that means? Yes, and so there are various different strategies in investing. Some are long term, some are short. What a short seller does is it borrows stock with the idea that in a short amount of term, that stock is going to drop, and that they're going to be able to buy it back at a smaller price and make a profit. Muddy Waters, much like any other short seller, advises the market. The market knows that and puts that forth. The information, though, that short sellers, activist short sellers... So it's to Muddy Waters' advantage if the stock falls? Yes. So, why aren't the facts that Muddy Waters had a short position enjoy, and that the report disclaimed any warranty of any kind sufficient to support the district court's determination that the report lacked reliability? Because that would be inconsistent with the Ninth Circuit's opinions in Nectar and Bofi. The proper inquiry is the market knows that. They've already been told. So the market is piercing through. They're looking at the information that the short seller report is providing. And the quantum scape opinion that we cited canvases the law consistent with the Ninth Circuit, and you look at a variety of factors, nondisclusive, to look at the actual information and determine it. Certainly, it's a consideration that this is a short seller report, and that should be considered. But you look at the level of detail that's provided, the corroborative nature, the coherence and plausibility of the allegations, the number of sources, and the reliability of sources. It's important to note that with these, particularly with the subject matter of this fraud, China-based issuers trading on U.S. stock exchanges, the traditional gatekeepers of the integrity of the market have been extremely constrained in identifying the fraud. You don't have the SEC because they have no ability to regulate, compel documents. You don't have auditors because they're under no authority by the PCOAB, and even traditional financial journalism is under stress. What has been incredibly successful is this very activist hedge fund, Muddy Waters. And we put that forth in the complaint, their credentials, their reliability. They themselves have been responsible for delisting eight separate issuers. And they have expertise in this area of identifying, specifically, China-based issuers that are also involved in accounting fraud and round-tripping. And so you come with that, that this firm has a track record. And then the court then looks at what's the information? What is the market reacting to? Because the market's- The fact that they have a track record, does that matter in the evaluation? It does because you look at Nectar and Bofi. In those cases, those were fly-by-night short sellers posting on, seeking alpha at a website. This is a legitimate entity that has credence with the market. It's akin to a securities analyst firm. And that this court is readily familiar and has cited to as being information that the market reacts and moves to. So you have, can you point me to particular statements by Dr., I guess, Knobloch or plaintiff's confidential witnesses that support a determination that the report was reliable? Yes. So, Dr. Knobloch, at ER 66 and 67 of the complaint, goes over his independent review of the Muddy Waters report. He finds that Muddy Waters first looks at what was the analysis and methodology, looks at how Muddy Waters relied on Google Chrome web development to take in what the ID, the IP ID addresses were. Dr. Knobloch says, I've done that before. I've worked for Fetch Technologies. That's what my firm did. Second, in order to look at what- I'm sorry, I didn't hear that. Can you repeat that? Sure. How did either Muddy Waters or Dr. Knobloch determine that the IP addresses are associated with YY or Joy in some way? Well, it was through a plausible inference. There are two addresses. One has a block of 127.00.1. That is known in the industry as supported by the Muddy Waters and corroborated by Dr. Knobloch. That's an internal local server. So anytime you get that address, that means it's- That's within the industry worldwide or known within an industry that YY owns those addresses? No. If it has a 127.00 address, that's indicating that that's a communication within a local server. That's one machine within another machine talking to another. That's antithetical to Joy's business. Joy business is supposed to be getting- But how do we know that that's Joy's server? Well, no. That is what is coming from the purported paid user. And so the paid user is supposed to be making payments either from an external address that would be different from the 127.00 than here. So it's impossible. But where's the lead to show that that's Joy's server in some respect? Because you're taking the paying app IP. And if it has an internal message, it's simply an impossibility that that could be a legitimate paying user because they're supposed to be on an external server. These are people that are purportedly paying from their home, from their office, or in public in general. And so- Well, couldn't there be a big apartment building that has the same server and they're all paying into Joy and that would have the same effect? No, because then they would actually- then they would have to have shared the same server with Joy. Right. Because- But that's the point. How do we know that the server is Joy's? That's where I don't understand. Okay. You're right, Your Honor. We do not have an affidavit or an admission saying that this is precisely. But what we have is a reasonable conclusion. These are internal communications, just like the other network. It's an internal- Right. But that's my point. Couldn't a building all have internal communications and then, you know, that are not related to Joy and then be contributing to Joy? Maybe a possibility, but look at the sheer scale. They're finding that 50% of the payments, so it becomes unreasonable. So all they're paying user payments are operating off the same corporate, local, internal server. All the payments are using the same internal network. The network is even more compelling. You can't have a public communication on the 100.64. That's a network. It can only be people within the same network. This is supposed to be a global worldwide where, in addition to Chinese customers, they also have US-based and Singapore. It's just not plausible. But you also- the internal bots is only one part of it. There's also external bots. And the way that Muddy Waters, and it's consistent with what Dr. Knobloch said, the way that Muddy Waters identifies that is looking at abnormalities in behavior that aren't consistent. And so when you're looking at major performers who have, for 24 hours, constant streams of gift-giving, nobody's giving away money for free for Christmas for 24 hours a day. And that's what- The existence of some bots doesn't mean that the whole thing is a fraud, right? That's not your argument. No. It's to the material level in which Muddy Waters, and as corroborated by Dr. Knobloch, it's beyond a level- they took a tremendous sample size and found a tremendous percentage. I realize I'm getting down to my level. I'd like to reserve two minutes of rebuttal. My colleagues, no questions at this point? Go ahead. That's fine. All right. Then go ahead. Reserve. Thank you. Good morning, Your Honors. Good morning. May it please the Court, Stephen Blake on behalf of the defendant appellees. So I want to start with what my colleague identified as an undisputed fact, which is that the linchpin, the center of this complaint is built on a report by a known short seller. If you were to read the first page of the report, which is the excerpts of record at page 147, there's a long legal disclaimer there, and that says that the report stands to realize gains if the stock goes down. It's an opinion. There's no warranty as to its reliability or, in fact, no warranty of any kind. And that starting premise, I think, has implications for both the falsity pleading and the center pleading. One thing my colleague also acknowledged is that this particular short seller, Muddy Waters, has a track record. It has been targeting publicly listed Chinese companies for some time. And what my colleague referred to was there were some instances where those have led to delistings. And it stands to me, at least in stark contrast to what is alleged in the complaint here. And I call it the other shoes that drop. And what we have here is a highly technical analysis that's put out by this short seller. It's released at a time where the short seller had the maximum incentive to claim the broadest fraud possible. Because the day before the short seller report came out, the leading Chinese internet company Baidu, Baidu is kind of like Chinese Google, you use it to do search, Baidu announced that it was buying the business that Muddy Waters claims had 90% false revenue for $3.6 billion US, the day before. And so if you have a short position and somebody announces, we're going to buy this business for $3.6 billion, the stock goes up and you lose your shirt as a short seller. And so you have a maximum incentive to claim a fraud as broadly as possible. And so what we have here is when you start from that point. Although, we don't cancel. I mean, it is a pretty extensive report. It's not like they just generated it at the last second to try to tamp down the Baidu sale. I'll give them that, it's long and extensive, it didn't happen overnight. Yeah, certainly Judge Blumenthal, I agree with that. But when you pierce through the report, it takes time to build up these positions, right? So you'd be preparing a report. But when you pierce into the report and you look at what Judge Blumenthal in the district court identified as the linchpin allegation, the linchpin allegation is that a block of server addresses, which has the 100.64 IP address block, originated from the servers. And even if you go a step beyond that, and if you accept that that block of servers, which Muddy Waters at some point says is 10 IP addresses, and at some point acknowledges is 4 million IP addresses, right? It's a very, very broad block. The transactions that they say originated from that particular IP address block are three one hundredths of one percent of the observed transactions that they had. So if this is on a 12B motion, right? Okay. Okay. But it has to, so what's a little confusing to me is, I mean, generally there's certain things you have to presume to be true. And it seems that because of the CYANTER or the high pleading requirement, that the judge is weighing certain amounts of the evidence. So tell me why, which you're not really supposed to do, but you obviously have to meet the high enough pleading. So tell me how to get my appellate hat on here and convince me that the judge didn't overweigh things and throw things out in a credibility way that would be improper under this procedural place. Certainly, Judge Callahan. CYANTER pleading, I think, is often inferential and requires judges to weigh various competing inferences. The standard is you have to plead a strong inference of CYANTER, so not just a reasonable inference, a strong inference. And I think what Judge Blumenthal focused on is the fact that the core operations doctrine pleading here is the kind of primary, if not exclusive, basis that the plaintiff is attempting to plead CYANTER. So you have a short seller that says, this company is a massive fraud, 90% fraud. And then you have the plaintiff saying, because it was a 90% fraud, we're going to assume that there was CYANTER. And so the judge needs to grapple with that. And there is Ninth Circuit case law that deals with this question, Ninth Circuit case law starting with South Ferry, which is noting that the core operations doctrine can be applied in certain circumstances. It identifies those circumstances as unusual, extremely rare, and the circumstances are where it would be absurd to assume otherwise, then there was CYANTER. But I think in order to—and I think the parties cite the same cases, the same cases that come both before and after South Ferry are Bearson and Malone. And I think you have to look at Bearson and Malone and the circumstances that exist now and compare those to the circumstances of this case. And that's where I come back to where I started, Your Honor, which was other shoes haven't dropped. And so if you look at Bearson and you look at Malone, in Bearson it was government procurement orders. Those government procurement orders were canceled. This had devastating effects on the company. Employee layoffs, revenues went to zero, et cetera. But counsel, the question really is, in my mind, is if we disagree with the district court on falsity, there's no way we can affirm on CYANTER, right? Because I mean, if there's a 90 percent fraud, I think that does meet the core operations doctrine. It's an interesting question, Judge Pumente. I guess I would think about it in a slightly different way. And I think this is one of the concerns that South Ferry articulated very directly, which is that CYANTER is a separate element for pleading, right? And so what the court emphasized was this exception needs to be applied in a way that doesn't read that entire second element out of the statute. And so I think you could come to a conclusion from a pleading matter that the plaintiffs using Muddy Waters have met their pleading burden as to whether there's a plausible allegation of fraud. But I don't think that that necessarily requires you to then conclude that CYANTER exists. And I think the language in South Ferry is really what you have to grapple with. And so that again is why I come back to these other shoes, so to speak, because the cases that the Ninth Circuit is actually applying this absurd exception are very, very narrow. There's probably a dozen or so cases where this court has declined to apply the core operations doctrine. It's an exceedingly narrow set of cases where the court has chosen to do so. None of those are short seller cases. And they are cases where there are objective indicia of fraud separate and apart from the say-so. So I wanted to start with how you started, which is the linchpin of the whole fraud allegation is this IP addresses are internal to YY. So is that allegation adequately pled? And do we have to take that as true? No. No. And I think I heard my colleague acknowledge that there isn't an affidavit or there isn't a citation that points you to that. It is assumed in the report. And I guess the question, do you agree with the, I mean, what's wrong with the assumptions that your colleague on the other side made, which is that they're all internal and there's a large amount. So the inference is that this is YY servers. Right. Right. Well, so, but we really are talking about inferences built upon inferences here. So there's two separate allegations. One is the hundred. Well, they're sort of saying where there's smoke, there's fire. So at what point does it fire turn into cyanter? Well, that's a very good analogy, Your Honor. I would say that three one hundredths of a percent is not smoke, it's a spark. And that's kind of what we have is we have, you know, we have people that are looking at these platforms and looking at these Internet platforms from the outside in is very challenging. Figuring out what's a bot and what's not a bot is very challenging. What do you consider to be the weakest link in plaintiff's assertion of investment fraud? The weakest link? Yeah. What do you consider? There are none in this case of what I would consider to be the traditional indicia of fraud pleading. And one of those is motive, Your Honor. Right. And so typically what you'd see in a case, and you see these in securities cases over and over again, if you're operating a business that's a ninety percent fraud and you're an insider and you have stock, you try to sell that stock because that's how you capitalize on the fraud. No allegations of that here. No allegations of it. Well, hey, why not sell into Baidu because you stand to gain a lot of money if you get sold? Well, that's a very good allegation. Well, that was pled. I agree. It was. It was pled. But what is also pled, and you can look at the excerpt of record 133 here, which is paragraphs 209 and 210 of the complaint excerpt for record 125, which is paragraph 193 of the complaint, which is one that Baidu proceeded to substantially complete its acquisition after an investigation had been conducted. And the second is that there was an independent investigation that was conducted and that Fairwater's allegations were, quote, not substantiated by those. And the plaintiffs, I think, have somewhat different takes on those facts. But this is where the inferential weighing of inferences comes in on the CNTER analysis. The court necessarily needs to look under TELLABS at the totality of circumstances. Paul, why don't you tell me why your client thinks that Dr. Knobloch did not corroborate plaintiffs' allegations of investment fraud? For two reasons, Your Honor. The first is Dr. Knobloch does not state an opinion on this core linchpin theory that Judge Blumenfeld focused in on his opinion. He doesn't. He makes a general statement. I think Muddy Water's analysis was reasonable. It's a very general statement. He does not validate the core allegation, nor does he attempt to duplicate the work that Muddy Water's has done, or allegedly has done. But what he says is, you know, if the assumptions Muddy Water's made are true, then I think it's reasonable. And that's very, very different because the actual analysis, so that's a core allegation, the linchpin allegation. The actual analysis that Dr. Knobloch undertakes is very, very different than this IP address originating from the system. He looks at, I think, about 10 performers on the platform. And he says, looking from the outside in, I see indications that there is bot activity. But what's lacking there is a connection, one, to whose bots are they? External or internal bots, if there are bots? And two, how does that tie into revenue at all? And so the analysis that he does is kind of a fairly simple analysis, at least compared to what Muddy Water's is purporting to have done. And it's a different analysis. He's looking for anomalies, and he's saying anomalies are consistent with what Muddy Water's alleged. But he's not diving into the linchpin allegation and saying, I agree with this, these bots that Muddy Water's is allegedly identifying clearly came from Joy's servers or YY's servers. So, counsel, I still don't quite understand your argument on the internal server issue. Is it, one, that the Muddy Water's report doesn't prove it, and so therefore we should not take it as true? Or is your argument that even if it is true, it's only 0.03% of transactions, and so therefore it doesn't prove falsity in any way? I would probably lean more heavily on the first one, which is, I think, the essential missing link here. And it's not that they don't prove it, right? We're talking about pleading. We're not talking about... Right. They don't even explain it. They just assume it. And so... Right. That's my point. So then we can't take that allegation because it's not sufficiently, you know, there's no sufficient, plausible... It's not plausible. Is that your argument? Or what precisely is your attack on that allegation? Correct. Correct. This is a circumstance where, obviously, under Rule 8, you have plausibility pleading. It's also a federal securities claim under Rule 9b in the PSLRA. So you have to hit plausibility. You also have to plead with particularity, and this is a missing link, so to speak. But then I would go beyond there because the district court went beyond there, right? The district court looked at reliability more broadly than this one specific point. And that's where the Nektar case comes in. That's where the Deyo case comes in as well. And the court looked at Muddy Waters and said, you know, this is a firm that has a history in financial analysis. It doesn't have a history of running an anti-bot operation. And we don't know who actually undertook this report. And so we don't know who the authors are. We don't know who undertook the bot analysis. We don't know really anything at all other than a general statement of this is the methodology that was undertaken at a high level. And so it's really both of those, Your Honor, which is a failure to hit the linchpin, a failure to establish the reliability. And that, frankly, has implications across both falsity and scienter. But the court does need to think about both of those in slightly different ways, walk and chew gum at the same time, if you will. All right. Your time's expired. Thank you, Your Honor. Do any of my colleagues have additional questions? All right. Thank you. All right. You have a little bit of rebuttal time. Okay. Just really briefly. With the legal disclaimer, that disclaimer is in every single financial industry statement. It's in both Schwartzellers and Long. So if we take that, then we can't trust the most trustworthy institutions like Goldman Sachs, Morgan Stanley, et cetera. Didn't happen overnight. That's correct. Joy was studied by Muddy Waters for over five years. The 12B6, in terms of overweighing, that's precisely what the court did. The court went past even a Daubert standard and said, I don't believe what your expert is saying. I don't believe what Muddy Waters is saying. That's not proper. That's for a later date and likely to be made by the jury. Burson and Malone are cases stronger. Those had to deal with a single customer or a regional outfit. This is 90% of the business. But the question of other shoes dropping, they have. The Baidu transaction still has not closed. YY Live has disappeared. A $3.6 billion enterprise has disappeared from the books. Joy has no CFO. And so others have dropped. I would encourage the court to take a look at China Education, which I think is the most analogous. It's a short seller report. You don't look at the background researchers or staff that are doing the technical analysis. You look at the firm and the credibility of the firm, the plausibility of the information. I think that's it. I'm out on time. All right. Thank you both for your argument. This matter will stand submitted. And I believe the court is in recess for this week. All right. Thank you. All right.
judges: SCHROEDER, CALLAHAN, BUMATAY